# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

**FILED**

Jun 23, 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SEALED

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| AHMAAD AKHTAR | ) | 2:25-mj-0097 AC |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____February 2025 to present_____ in the county of _____San Joaquin_____ in the

_____Eastern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| **18 U.S.C. § 2339B** | **Attempting to provide material support to a designated foreign terrorist organization** |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____/s/ Timothy Paulson_____
*Complainant's signature*

_____FBI Special Agent Timothy Paulson_____
*Printed name and title*

Sworn to me and signed via telephone.

Date: ____June 23, 2025____

City and state: ____Sacramento, California____

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Timothy A. Paulson, being first duly sworn, hereby depose and state as follows:

### I.    INTRODUCTION

1.    I make this affidavit in support of an application for a criminal complaint and arrest warrant for AHMAAD AKHTAR for a violation of 18 U.S.C. § 2339B – attempting to provide material support to a designated foreign terrorist organization.[1]

2.    I also make this affidavit in support of applications for search warrants under Federal Rule of Criminal Procedure 41 for a warrant to search:

> a)    AKHTAR's person;
>
> b)    AKHTAR's vehicle, which is a black Toyota 4Runner, license plate number 9HKZ291 ("the TARGET VEHICLE"); and
>
> c)    AKHTAR's residence, which is the premises located at 1630 Acacia Street, Stockton, CA 95203 ("the TARGET ADDRESS");

as further described in Attachment A.  The warrant applications request to search AKHTAR's person, the TARGET VEHICLE, and the TARGET ADDRESS, including a search of any and all cellular and smart phones, and any computer and computer-related media located therein, for contraband and evidence, fruits, property, and instrumentalities of 18 U.S.C.§ 2339B – attempting to provide material support to a designated foreign terrorist organization ("the TARGET OFFENSE"), as described in Attachment B.

### II.    PURPOSE AND AGENT BACKGROUND

3.    I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so since June 2006.  I graduated from the FBI Academy in Quantico, Virginia in October 2006.  During the Basic Field Training course, I learned the necessary skills, tactics and techniques needed to perform my

---

[1] As defined by 18 U.S.C. § 2339A(b)(1), "the term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials[.]"

1

investigative duties as an FBI Special Agent.  I also learned how to conduct investigations of criminal activity, execute search and arrest warrants and seize evidence of violations of United States law.

4.    I, after serving several years in the FBI San Francisco Office, am currently assigned to the FBI's Sacramento Field Office, Stockton Resident Agency, where I have worked on, and participated in, a variety of cases, including cases related to acts of Domestic Terrorism, violent crimes, firearms violations and interstate communications of threats.  In addition, I have participated in investigations of terrorism-related activities my entire career and am familiar with tactics, methods, tradecraft, and techniques of terrorists and their agents.  I have received training regarding counterterrorism investigations, terrorist financing, operations, and strategies, and have knowledge of various extremist groups, their ideologies, and their involvement in terrorist activity.  I have received training, and I have gained experience, in interviewing and interrogation techniques, arrest procedures, physical surveillance, search warrant applications, the execution of search and seizures, computer evidence seizure and processing, social media analysis and various other criminal laws and procedures. I have testified in Federal court and have executed search and arrest warrants.

5.    As a result of my training and experience with the FBI, and conversations I have had with other law enforcement officers, I am familiar with the federal laws pertaining to providing material support to a designated foreign terrorist organization.  Additionally, I am a federal law enforcement officer who is engaged in enforcing federal criminal laws, including violations of Title 18.

6.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter and not all potential evidence.  Facts not set forth in this affidavit are not being relied on in reaching my conclusion that a search warrant should be issued.  Nor do I request that this court rely on any facts not set forth herein in reviewing this affidavit.

7.    This affidavit is based upon my own personal knowledge and the knowledge of other law enforcement officers involved in this investigation.  Where I describe statements made by other people (if any, to include other special agents and law enforcement officers), the statements are described in sum, substance and relevant part.  Similarly, where I describe information contained in reports and other

documents or records in this affidavit, this information is also described in sum substance and relevant part.

8.    Based on the facts set forth in this affidavit, there is probable cause to believe that AKHTAR has violated 18 U.S.C. § 2339B – attempting to provide material support to a designated foreign terrorist organization.  Further, there is probable cause to believe that the evidence, fruits, and/or instrumentalities of these violations are currently to be found at the locations identified in Attachments A-1 through A-3, and that the location information described in Attachment B will constitute evidence of these criminal violations.

### III.    BACKGROUND ON THE ISLAMIC STATE OF IRAQ AND AL-SHAM

9.    On or about October 15, 2004, the U.S. Secretary of State ("Secretary") designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist ("SDGT") under section 1(b) of Executive Order 13224.  On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (*i.e.*, "ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  On September 21, 2015, the Secretary added the following aliases to the FTO and SDGT listings: Islamic State, ISIL, and ISIS.  On March 22, 2019, the Secretary added the following aliases to the FTO and SDGT listings: Amaq News Agency, Al Hayat Media Center, Al-Hayat Media Center, and Al Hayat.  To date, ISIS remains a designated FTO.

### IV.    PROBABLE CAUSE

10.    I am familiar with the facts and circumstances described herein and make this affidavit based upon personal knowledge derived from my participation in this investigation.  Conclusions I have reached are based on my training, experience, and upon information I believe to be reliable from the following sources:

     a)     Oral and written reports to include analysis, about this investigation as well as related FBI, state, and local investigations, which I have received from other federal agents and other law enforcement agencies;

     b)     Physical surveillance conducted by federal agents, state, or local law enforcement agencies, which has been reported to me either directly or indirectly;

     c)     Information obtained from a third-party vendor discussed further below;

     d)     Information from an FBI Controlled Persona;

     e)     Law enforcement and public databases and records.

11. Unless otherwise noted, when I assert that a statement was made, I have personal knowledge of the information or I received the information from a law enforcement officer or FBI employee who provided the information to me, either verbally or in a written report. The officer or FBI employee had personal knowledge of the information or received it from a witness with personal knowledge of the information.

     a.  **AKHTAR's online communications with an FBI Controlled Persona and a face-to-face meeting with an FBI Undercover Employee, both of whom AKHTAR believed are affiliated with ISIS.**

12. Beginning in February 2025 through the present, AKHTAR has been communicating with an FBI Controlled Persona (UC1) on three different social medial platforms. In these conversations, UC1 posed as a member of ISIS in Iraq. During their initial conversation, which was on or about February 25, 2025, AKHTAR steered the conversation to the topic of ISIS, jihad, fighting infidels, and a deceased former leader of ISIS. Since this initial conversation, AKHTAR and UC1 have communicated often, sometimes daily or nearly so. Below is a summary of what AKHTAR discussed in his various conversations with UC1, grouped by topic:

- AKHTAR's voiced support for ISIS

- AKHTAR's expressed desire to travel overseas to join and fight with ISIS

- AKHTAR's statements related to violence

- AKHTAR's ownership of multiple registered firearms

- AKHTAR's stated plans to conduct an attack against a specific individual, who is yet to be identified by the FBI

1      - AKHTAR's stated plan to conduct an attack utilizing homemade explosives

2      - AKHTAR's stated desire to send money and guns to ISIS

3      - Following through on AKHTAR's stated desire to send money to ISIS by sending

4        multiple payments to a bitcoin wallet he believed is controlled by ISIS

13. Then, on June 23, 2025, AKHTAR conducted a face-to-face meeting with an FBI Undercover Employee (UCE) whom AKHTAR believed is affiliated with ISIS. During the meeting, AKHTAR provided clothing, binoculars, $400 cash, two loaded firearms, and six additional magazines. He later swore bayat (a pledge of loyalty) to ISIS.

14. The communications between AKHTAR and UC1 were all in a written format, and I have reviewed the communications between AKHTAR and UC1. These conversations mostly took place in English, and I have noted translations of key Arabic words, of which I am familiar through my training and experience, where necessary. AKHTAR had also indicated not having an issue understanding conversations. On February 25, 2025, UC1 stated, "Sorry if English not best but I try best." AKHTAR responded, "Your English is good akhi I understand it." It is also noted that this UC1 works and operates in another known state, outside of California.

15. As set forth in detail below, your Affiant determined that AKHTAR was the user of an account with Username: akhtheguy, Display name: عماد, ID number: 70471820292, on Social Media Application 1. UC1 engaged with AKHTAR using Social Media Application 1 starting in February 2025.

16. UC1 and AKHTAR began to communicate utilizing Social Media Application 2 in February 2025 through March 2025. AKHTAR's account on Social Media Application 2 was identified as account number 7188961338 and display name "A Tar."

17. In March 2025, UC1 and AKHTAR began utilizing Social Media Application 3. AKHTAR's account on Social Media Application 3 was identified as account number @12099101683.

**b. AKHTAR voiced his support for ISIS**

18. As explained above and based on my training and experience, I know that ISIS, which is also often referred to as The State, Dawla or other coded monikers, is a terrorist organization, which, in October 2004, was officially designated as such by the United States Secretary of State. During

conversations with UC1, AKHTAR routinely voiced his support and admiration for ISIS.

19.    For instance, on February 25, 2025, utilizing Social Media Application 1, AKTHAR asked UC1, "Akhi [my brother] what do u think of sheikh abu bakr al Baghdadi?"  AKHTAR followed this up by saying, "Akhi he says the truth and speaks the haqq [Arabic for truth] I believe it."  I know from my training and experience that Sheikh Abu Bakr al-Baghdadi is the former leader of ISIS who was killed by the U.S. Military in 2019.  In this statement, AKHTAR is telling the UC1 that he believes in the teachings and actions of al-Baghdadi.

20.    On February 26, 2025, AKHTAR, using Social Media Application 2, stated to UC1, "Akhi Alhamduillah [thanks be to God] I'm happy I met a Muslim brother from the state.  May Allah give victory to all the real Muslim brothers."  In my training and experience, I know that when AKHTAR is referring to the "state," he is speaking of ISIS and appears to believe UC1 is in fact a member and/or an associate of ISIS.  AKHTAR then stated, "Yes akhi I'm learning about the state and alhamdulillah I thank Allah that he opened my eyes (heart emoji; "SA" emoji).

21.    On March 2, 2025, AKHTAR again, on Social Media Application 2, voiced his admiration of ISIS by stating, "Tell them I keep my real Muslim brothers from the Dawla in my duas [prayers] and I pray to Allah to make me amongst the real Muslims."  In my training and experience, I know Dawla to be another common term used to refer to ISIS.  In referencing "real Muslims," AKHTAR appears to be exhibiting his opinion that only those associated with ISIS can be considered true to their faith of Islam.

22.    On March 7, 2025, on Social Media Application 3, AKHTAR claimed, "I've been watching and seeing videos of the brothers in the state and I am very happy there are good Muslims who are defending the honour of Muslims may Allah bless the mujahideen [Islamic fighters engaged in a "Holy War"] more and more."  By stating this AKHTAR voiced his support of ISIS and called for the blessing of ISIS fighters.

23.    On March 8, 2025, utilizing Social Media Application 3, AKHTAR told UC1, "Alhamdulilah akhi everything is good.  I'm thinking about how hard it is for my mujahideen Muslim brothers.  Allah will grant you jannah [heaven] akhi.  Keep going in the path of jihad.  That is the biggest honour and I feel embarrassed that my brothers are struggling and I am having it easy.  May

Allah bless the mujahideen more and more." In my training and experience, AKHTAR again praised the fighters (mujahideen) of ISIS as well as his view that jihad is righteous and justified.

24.    On March 13, 2025, on Social Media Application 3, AKHTAR told UC1, "Alhamdulillah akhi may Allah bless the brothers in the state. You guys fight in the path of Allah and I am proud to call the mujahideen my brothers." In this statement AKHTAR again voiced his positive view of ISIS and also continued to show his belief UC1 is a member of the terrorist organization.

25.    On April 10, 2025, utilizing Social Media Application 3, AKHTAR told UC1, "You guys are the real mujahideen akhi. You guys put your lives on the field for the sake of Allah that's why I love you guys. insha'Allah [if God allows] I pray one day Allah gives me courage and strength like the mujahideen to fight for Islam and against the munafiqs [Muslim false believers] and kuffar [infidels]."

26.    On April 19, 2025, using Social Media Application 3, while UC1 and AKHTAR discussed their relationship, AKHTAR wrote, "Wallahi [To swear by God] remember I tell I used to make Dua to Allah to give me strong Muslim brothers and he blessed me with mujahideen brothers from state." Again, AKHTAR showed his belief and understanding the UC1 is a member of ISIS.

**c.    AKHTAR expressed a desire to travel overseas to join and to fight with ISIS**

27.    During conversations with the UC1, AKHTAR has also indicated that he has been thinking about traveling overseas to join with ISIS for the purpose of providing support to the FTO. For instance, on February 25, 2025, using Social Media Application 1, AKHTAR told the UC1, "Mash'Allah [as God has willed] I love the brothers in Iraq and Syria the real Muslim brothers that r fighting insha'Allah Allah gives me the courage to join one day."

28.    Again, on February 25, AKHTAR posted, "When I say to join group I'm talking about the Islamic state akhi. I would never fight for any nationalism Syria Pakistan Iraq or anything like that." In this statement AKHTAR is clear about which group he supported and wished to join.

29.    On March 8, 2025, using Social Media Application 3, AKHTAR stated, "Akhi I love the mujahideen and each step the mujahideen takes Allah rewards the mujahideen. Akhi pray for me to be on the field with my brothers someday. I been thinking a lot and I don't want to live in a kafir [infidel] nation." In this statement, AKHTAR shows that he has been continuing to think about leaving the United States and seeking guidance and strength to leave and join his "brothers."

**d. AKHTAR made several statements related to violence**

30. During discussions with UC1 and others, AKHTAR has frequently made statements related to a desire to conduct potential violent acts. AKHTAR has expressed his feelings on being surrounded by infidels, his belief that infidels should be controlled or they will hurt Muslims, and that he prays for a way to humiliate and destroy the infidels.

31. For example, on March 11, 2025, on Social Media Application 3, AKHTAR told UC1, "Life is stressful here akhi. We are surrounded by the kafir [infidel] and they are dirty and you have to keep them in control or they think they can harm Muslims but Alhamdulillah pray to Allah to help me humiliate and destroy the dirty kafirs here akhi." AKHTAR lives in Stockton, California, and his current employment requires that he frequently travel throughout the state of California. By "here," he appears to be referring to the United States.

32. On March 13, 2025, AKHTAR expressed his opinion on other Muslims in the United States saying, "Akhi there is not much to do here. A lot of Muslims in America are too scared to talk about jihad or mujahideen." He followed up with, "I don't like being around them too much because they don't ever want to form a group to go and beat up the kafir akhi. Just last week a Muslim woman was attacked by a kafir at a store. When I bring up that we should form a group and protect Muslims in our community they don't take it seriously akhi." In these statements AKHTAR implied a willingness to gather other Muslims for the purpose of committing violent acts against others.

33. AKHTAR made additional statements about wanting to be a martyr for his religion. On March 20, 2025, on Social Media Application 3, he told UC1, "Akhi family is a blessing but I want to die in the cause of Allah fighting the kuffar. Make Dua [prayer] Allah gives me strength to join my brothers soon." And on April 2, 2025, he said, "I do akhi I want to sacrifice for Islam insha'Allah Allah gives me the courage and strength akhi."

**e. AKHTAR owns multiple registered firearms.**

34. Per records checks with the State of California Automated Firearms System, AKHTAR owns the following three firearms:

    Make/Caliber: Colt 45
    Type: Semi-Automatic Pistol

Model: O1980XSE
DOT: 11/06/2014

Make/Caliber: Glock 9mm
Type: Semi-Automatic Pistol
Model: 19
DOT: 08/14/2023

Make/Caliber: Heritage Arms .22
Type: Revolver Pistol
Model: Rough Rider
DOT: 06/27/2023

35.    On March 13, 2025, on Social Media Application 3, AKHTAR told UC1, "Akhi, I just brought some guns to protect my family and of course Allah is the ultimate protector."  When asked about his firearms, he posted the below picture to the chat:



36.    Based on my training and experience, the firearms depicted in this picture AKHTAR sent to UC1 appear to match those that are registered to him.  On the same day, he also stated, "In America it's really hard to get ak 47.  I have to stay prepared for the dirty kafir akhi!!  I always pray to Allah to give me the upper hand over any kafir in case I get in a conflict."

37.    On April 10, 2025, AKHTAR told UC1 that he regularly carries a knife and a firearm on his person.

38.    On April 17, 2025, AKHTAR stated to UC1, "Akhi I carry the pistol.  I play jihad nasheeds [a prayer, poem, etc., that is sung typically in Arabic] in the car so if a dirty kafir do anything I have to be ready akhi. Lol."

39.    On May 7, 2025, AKHTAR discussed his concerns regarding how he perceived Muslims being treated in the United States stating, "That's why I take my knife and gun with me everywhere akhi because the kafir in America are starting to do stuff especially to women but I don't know why brothers let their wives, sisters, mothers go out by themselves."

      **f.    <u>AKHTAR discussed plans to conduct a violent attack against a specific individual, who is yet to be identified by the FBI.</u>**

40.    On April 3, 2025, using Social Media Application 3, AKHTAR stated, "Akhi I'm going to tell u something. I drove by a Jewish temple and I see one guy. He is always there on Saturday. He was in Israeli army. I follow him and now I am following him to see where he live."  Followed by the statement, "insha'Allah I will handle this kafir akhi."

41.    In response, UC1 asked him about his plan.  AKHTAR then said: "Right now I just want to find out where he lives."  "Akhi when you get some time tell me what I can do once I find out where this Israeli soldier lives."  "Akhi in the city I live there is a lot of murder in thinking of just killing this kafir in a random place and it'll be seen as a regular murder but akhi u know these Jews have connections and they will investigate."

42.    Later in this conversation, AKHTAR said, "I will plan this out more insha"Allah akhi. I will talk to you again soon Insha'Allah."

43.    On April 10, 2025, utilizing Social Media Application 3, UC1 inquired about AKHTAR's prior statements about planning to attack the unknown individual at the Jewish temple. AKHTAR told UC1 in response, "I see him around my city when I drive.  I always keep my knife and gun with me.  Insha'Allah my next step is to follow him to see where he live next time I see him akhi." AKHTAR then says, "insha'Allah Saturday I always drive by the jew temple he drives a red truck so I always look for that."

44.    During conversations with UC1, on May 27, 2025, using Social Media Application 3, AKHTAR again referred to this person and stated, "I still haven't seen that one Jew akhi I need to start driving around after work again insha'Allah".

45.    Based upon my training and experience, I know that ISIS encourages its supporters in the United States to further its jihadi mission by committing violent acts wherever they may be living.  This

appears to be consistent with AKHTAR's statements about planning and putting thought into potentially conducting an attack on an individual with the ultimate goal of killing him and making it appear as a random attack.

46.    There is a Jewish temple located in Stockton, California.  While conducting investigation and surveillance, FBI has seen a red truck parked in the parking lot of this temple.  The FBI has identified the registered owner of this red truck, who does not appear to resemble an Israeli soldier.

**g.    AKHTAR discusses plan to conduct an attack utilizing homemade explosives**

47.    On May 27, 2025, while talking on Social Media Application 3, AKHTAR shared that he had been working on a plan to conduct a terrorist attack.  In a series of messages AKHTAR expressed the following:

> Akhi my friend send me one story.  There are some kafir (cross worshippers and Jews). They are preparing to attack Muslims in California.  Akhi I have a plan. I'm thinking of making something insha'Allah but I need to be careful and not get caught so I can do more.  They were talking about it on radio.   Still a lot of Muslims just sleeping here akhi.   They are so comfortable and sitting ducks and have no shame, honor, or dignity to protect Muslims and their families.  And it's more scary because a lot of fake Muslim here they work for fbi and cia so if I try to talk to young brothers they snitch on real Muslims.  But make Dua akhi that Allah helps me get a plan and some strong brothers to humiliate the dirty kuffar here in California.

48.    During their conversation UC1 told AKHTAR to be careful.  AKHTAR responded, "Akhi these kuffar hold these kind of events openly and they talk about how they should kill and abuse Muslims.  I want to go to one of these events and act like them and gather information first.  What u think of this plan?"  When questioned how he could do this AKHTAR said, "No Akhi I can dress like them and wear their clothes and talk like them.  But I need some help in how to make a boom [Explosion emoji]."  AKHTAR then sent two messages back to back, one stating, "Ok akhi insha'Allah when I get chance if u get me this information for boom".  The second stating, "Ok akhi insha'Allah when u get chance if u get me this information for boom."  AKHTAR then stated he currently does not have a location for this act but would try to get one.

**h.    AKHTAR stated a desire to send money and guns to ISIS**

49.    AKHTAR indicated on several occasions to UC1 that he was seeking a means to provide

support to ISIS.  As an example, on February 26, 2025, using Social Media Application 1, AKHTAR asked the UC1, "Akhi do u have money gram or western union?  I wanna send money weekly if u can give it to some needy Muslims and u can use for your family too if that's fine."

50.    On March 7, 2025, using Social Media Application 3, AKHTAR asked UC1, "Akhi how can I send money to u? I wanna send so if u can distribute to the brothers and families."  In my training and experience, I believe "brothers" is referring to members of ISIS.  In addition, as based upon other statements (some of which are summarized above), it is apparent that AKHTAR believes the UC1 to be a member or associate of ISIS.  This statement shows AKHTAR's willingness to provide money to an individual for the purpose of supporting a designated FTO.

51.    On April 14, 2025, AKHTAR again brought up the subject of financial support to UC1. AKHTAR stated, "Akhi when u get chance and some time can u find out how I can send u money to help brothers doing jihad.  In America they don't allow to send Bitcoin so if u can see if I send u money through western union."  Again, AKHTAR indicated a desire to provide financial support to the "brothers doing jihad."

52.    The following day, April 15, 2025, AKHTAR again asked UC1 about providing money and guns to ISIS saying, "Akhi wallah [may God be my witness] I wish I can send u guys stuff easy I would send u all kinds of guns."  Followed by, "But akhi when u get time find out from someone if I can send money to u in western union because here in America they block people from sending crypto or Bitcoin on telegram."

53.    On April 15, 2025, AKHTAR continued and stated, "Akhi I wanna send you 200 dollars a week."  Then a little bit later, "Ok akhi I think the least I can do is support my brothers with some money."

54.    On May 23, 2025, while the UC1 was discussing a new shipment of equipment UC1 had received, AKHTAR again expressed his desire to send weapons to UC1 by stating, "I wish I could send u weapons from here akhi the Americans are kuffar and our enemies but they make good quality weapons".

/ / /

/ / /

**i.** **AKHTAR followed through on his expressed desire to provide material support to ISIS by sending multiple payments to a Bitcoin wallet he believed was controlled by ISIS.**

55.    On April 17, 2025, using Social Media Platform 3, as requested by AKHTAR, UC1 sent AKHTAR a link to a crypto currency wallet.  In fact, the FBI controls this wallet.  UC1 informed AKHTAR that UC1 has spoken with the brother who handles finances, stating, "Alhmadullah (sic) Akhi I talk with brothar (sic) and I tell he I have brothar (sic) wants to help."  UC1 continued, "Akhi he say the brotbar (sic) can send for this crypto account is safer for us and we use".  UC1 then sent the link to the wallet informing AKHTAR that bitcoin could be sent to that wallet.  In response, AKHTAR stated, "Ok no worries akhi I see the Bitcoin app I will download and send insha'Allah.  It's the small thing I can do to help my brothers."

56.    On April 18, AKHTAR confirmed with UC1 that he had downloaded the CoinBase application, for purposes of sending bitcoin, and had set up an account.   AKHTAR then told UC1 that he would begin sending money on Friday (April 25, 2025) as the account wouldn't allow transfers until after April 24, 2025.  AKHTAR sent UC1 a screenshot:



/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

57.     On April 25, 2025, believing he was sending money to ISIS, AKTHAR sent .002109 in bitcoin (approximately $198.00 at time of purchase) from the CoinBase platform to the crypto wallet controlled by the FBI.  One week later, on May 2, 2025, AKTHAR sent .001031 in bitcoin (approximately $100.00 at time of purchase) to the FBI controlled crypto wallet.



58.     On May 9, 2025, utilizing Social Media Platform 3, UC1 told AKHTAR, "I want give you good news Akhi beucae [sic] you is doing the best in helping akhi so I want you prove what the help you give is giving us we buy this and we use what you send.  Jazak Allah akhi inshallh [sic] more I will buy this next week inshllah [sic].  UC1 then sent the following photo of firearms to AKHTAR, indicating that these guns were bought with the money AKHTAR had sent:



59.     AKHTAR's response after being shown what his money had purchased was, "Walaikum As Salam Wa rahmatul Allah wa barakatu akhi [Peace be upon you and the mercy and blessings of Allah be upon you].  Masha'Allah akhi may Allah bless you and may Allah destroy our enemies.  Akhi I will send the brother money today later insha'Allah I will send u receipt."  AKHTAR also "hearted" the UC1's prior message and the picture of the guns.

60.     Later that same day AKHTAR sent .001453 of bitcoin (approximate $151.00 at time of purchase) to the FBI controlled wallet.

61.     AKHTAR has continued to send weekly payments to the FBI controlled wallet, under the

belief that he is sending monetary support to ISIS for the purchase of weapons. On May 16, 2025, he sent a fourth payment of .001448 in bitcoin (approximately $149.00 at time of purchase) and a fifth payment on May 23, 2025, of .00138 bitcoin (approximately $150.00 at time of purchase).

62.    On May 23, 2025, after notifying UC1 that he had sent bitcoin, UC1 responded, "Wallahi ya Akhi [I swear by God, my brother] we say Shukraa [Thanks] for you for the help ya Akhi Shukraa for help us in the fight (Twaheed flag emoji) Jazak Allah ya akhi [May Allah reward you]". In response, AKHTAR stated, "Of course my brother this money belongs to Allah and he will question me how I spend it and I want to help my brothers against the kuffar." In making these statements AKHTAR is saying he would prefer his money be given to support ISIS than used on other endeavors.

**j.    AKHTAR provided cash and firearms during an in-person meeting**

63.    On June 23, 2025, AKHTAR conducted a face-to-face meeting with an FBI Undercover Employee (UCE) whom AKHTAR believes is affiliated with ISIS. During the meeting, AKHTAR provided clothing, binoculars, $400 cash, two loaded firearms, and six additional magazines. He later swore bayat [pledge of loyalty] to ISIS.

**k.    In online communications with other individuals, AKHTAR expressed the same radical ideology, violent ideations, and desire to send money to ISIS.**

64.    Since at least February 2025, AKHTAR also engaged with other individuals (some whose identities are known to the FBI and others whose identities are unknown to the FBI) on Social Media Application 1 who are not FBI controlled personas. The FBI obtained some of these conversations from Social Media Application 1.

65.    AKHTAR communicated with the user of an account (User 1) on Social Media Application 1. On May 13, 2025, AKHTAR made threatening statements associated with his radical ideology to User 1. During this conversation, AKHTAR stated, "Soon akhi the day will come when the head of every evil dirty jew and their slaves the cross worshippers will have their heads plucked like a chicken…"

66.    AKHTAR also communicated with a user of a different account (User 2) also on Social Media Application 1. During a conversation with User 2 on February 4, 2025, AKHTAR asked, "I'm sorry brother I can read Arabic but I can't speak or understand but it's ok you can reply to me in Arabic

I can translate.  I want to ask how I can help the mujahideen brothers in the field.  I want to send some money weekly if it's ok?"

67.    Later during this same conversation, User 2 told AKHTAR to use the social media platform Telegram.  AKHTAR responded, "Ok akhi unfortunately sending money through Telegram is blocked in America.  Insha'Allah if u come across any other opportunities for me to send money to the brothers let me know insha'Allah.  I have money gram and western union too."   These comments show AKHTAR had been attempting to find someone to receive money on behalf of the "mujahideen brothers in the field" even prior to his contact with UC1.

**l.    AKHTAR is the user of the three referenced social media accounts and the CoinBase bitcoin wallet.**

68.    On April 4, 2025, legal process was served on Social Media Application 1 as to username akhtheguy, ID number 70471820292.  The returns from Social Media Application 1 showed that the registered and verified email address is ammaadkhtr@gmail.com.  This email address closely resembles AKHTAR's first and last name.  AKHTAR had reported this email address to his employer as one of his personal methods of contact.

69.    The personal identifiers that AKHTAR disclosed to UC1 over the social medial applications are also consistent with his own.  On February 25, 2025, utilizing Social Media Application 1, AKHTAR told UC1 he was thirty-three years old, which is consistent with AKHTAR'S known age.  In addition, from this account, on March 13, 2025, AKHTAR asked User 1 if they had heard of "Stockton" and that there is a lot of crime in Stockton.  Your affiant notes Stockton, California is where AKHTAR resides.

70.    After some conversations on Social Media Application 1, UC1 asked AKHTAR on February 25, 2025, if he had an account on Social Media Application 2.  AKHTAR said yes and shared a screen shot of a QR code related to Social Media Application 2 for an account with a username of "A Tar."

71.    On March 7, 2025, during discussions on Social Media Application 2, AKHTAR stated he had an account on Social Media Application 3 under the account @12099101683.

72.    On April 4, 2025, legal process was served on Social Media Application 3 as to account

@12099101683.  The returns from Social Media Application 3 showed that the associated phone number with this account is 209-910-1683.  Legal process was served on T-Mobile as to the subscriber and toll records associated with phone 209-910-1683.  Results from T-Mobile showed AKHTAR is the registered subscriber of this phone number.  AKHTAR's father's name appears on the return as the "account name."

73.     Law enforcement conducted a ruse call to 209-910-1683 on April 9, 2025.  The individual who accepted the call on the Target Cell Phone identified himself as AMMAAD AKHTAR.

74.     On May 24, 2025, while having a conversation on Social Media Application 3, AKHTAR shared his email address as ammaadkhtr@gmail.com, which matches the email account associated with Social Media Application 1.

**m.  <u>There is probable cause to believe that the TARGET VEHICLE and the TARGET ADDRESS are AKHTAR's.</u>**

75.     From April 3, 2025 to the present, the FBI has been conducting physical surveillance on AKHTAR.  As recently as June 15, 2025, AKHTAR has been observed at the TARGET RESIDENCE and, on the same day, observed driving the TARGET VEHICLE.

76.     AKHTAR is the registered owner of the TARGET VEHICLE.  On March 20, 2025, checks with the California Department of Motor Vehicles showed a black 2007 Toyota 4-Runner, vehicle license plate 9HKZ291 as registered to AMMAAD AKHTAR.  FBI has confirmed through recent surveillance that AKHTAR regularly drives the TARGET VEHICLE.

77.     The TARGET ADDRESS is AKHTAR's self-identified address.  Open source paid services identify AKHTAR as associated with 1630 Acacia Street, Stockton, California, since approximately 2024.  FBI has confirmed through recent surveillance that AKHTAR currently lives at the TARGET ADDRESS.  The only other individuals known to also reside at the TARGET ADDRESS are AKHTAR's wife and AKHTAR's son, a young male child.

**V.     <u>COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS</u>**

78.     As described above and in Attachment B, this application seeks permission to search for records that might be found on AKHTAR's person, in the TARGET VEHICLE, or in the TARGET ADDRESS (including on relevant digital devices found inside), in whatever form they are found.  One

form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrants for which I am applying would authorize the seizure and subsequent search of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure.

        **a.     Probable cause**

79.    I submit that if a computer or storage medium is found on the Subject Premises or on AKHTAR's person, there is probable cause to believe relevant records will be stored on that computer or storage medium, for at least the following reasons.

80.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

81.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

82.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

83.    Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

84.    Based on actual inspection of other evidence related to this investigation, I am aware that computer equipment was used to generate evidence, fruits, and instrumentalities in the offenses under investigation.  Hence, I submit that there is probable cause to believe that there is a computer system currently located on the Subject Premises.

### b.    Forensic evidence

85.    As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  I submit that there is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Subject Premises for the following reasons.

86.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

87.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the government to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (such as registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus

inculpating or exculpating the computer owner.

88.    Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.   For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the Internet Protocol ("IP") addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

89.    Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (such as a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.

90.    Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (such as internet searches indicating criminal planning), or consciousness of guilt (such as running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

91.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

92.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not

always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrants for which I am applying.

93.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

94.     Based on my training and experience, I know that when an individual uses a computer in connection with a criminal offense, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of internet discussions about the crime; and other records that indicate the nature of the offense.

### c.     Necessity of seizing or copying entire computers or storage media

95.     In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following facts.

96.     As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and

who has used it requires considerable time, and taking that much time on premises could be unreasonable.  As explained above, because the warrants call for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrants can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

97.    Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Subject Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

98.    Records sought under these warrants could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.  Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrants I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrants, and would authorize a later review of the media or information consistent with the warrants.  The latter review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

99.    Because it appears likely that other individuals in addition to AKHTAR share the Subject Premises as a residence, it is possible that the Subject Premises will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  Based on my training and experience, I know that digital devices can be located in any area of a shared residence and that digital devices can be shared by cohabitants.  I am not aware of any areas of the Subject Premises to which AKHTAR lacks access or in which it would be impossible for him to store evidence.  The warrants for which I am applying would authorize the seizure of such devices that are reasonably

believed to belong to AKHTAR or to have been used in the offenses under investigation.  If a forensic

review determines that there is no evidence of the suspected crimes on a computer or storage media,

reasonable efforts will be made to return the items to their owners.

## VI.    CONCLUSION AND REQUEST FOR SEALING

100.    Based on the foregoing, there is probable cause to believe that AKHTAR committed one

or more violations of 18 U.S.C. § 2339B – attempting to provide material support to a designated

foreign terrorist organization.  In addition, there is probable cause to believe that evidence, fruits, and

instrumentalities of these violations, as more fully described in Attachment B, may be found in the

locations identified in Attachments A-1 through A-3.  Accordingly, I request that the Court issue the

proposed criminal complaint and arrest warrant, and issue the proposed search warrants authorizing a

search of AKHTAR, the TARGET VEHICLE, and the TARGET ADDRESS, as fully described within

Attachments A-1 through A-3, and the seizure of items set forth in Attachment B.

101.    I further request that the Court order that all papers in support of this application,

including the affidavit, criminal complaint, arrest warrant, and search warrants, be sealed until further

order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor

known to all of the targets of the investigation.  Accordingly, there is good cause to seal these

documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/ Timothy A. Paulson

Timothy A. Paulson
Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically
before me on this 23 day of June 2025

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

/s/ Elliot C. Wong

Approved as to form by AUSA ELLIOT WONG

### **ATTACHMENT A-1**

**Person to Be Searched**

The person to be searched is AHMAAD AKHTAR, born January 7, 1992. AKHTAR is identified in California Department of Motor Vehicle records as standing 5'10", with black hair and brown eyes:



## ATTACHMENT A-2

### Property to Be Searched

The property to be searched is a black Toyota 4Runner, with California license plate number 9HKZ291.



## **ATTACHMENT A-3**

### **Property to Be Searched**

The property to be searched is the single-family residence located at 1630 Acacia Street in Stockton, California 95203 ("the SUBJECT ADDRESS").

The SUBJECT ADDRESS is a yellow single story family residence with a detached garage.

The property to be searched includes the entire residence as well as the grounds surrounding the home, including any outbuildings, detached structures, garages, or sheds, as well as any motor vehicles, boats, trailers, or off-road vehicles provided that they are parked on the property itself. The scope of the search extends to any areas of the premises to which AKHTAR has access to, including common areas.





**ATTACHMENT B**

**Items to be Seized**

1.      All records relating to violations of 18 U.S.C. § 2339B occurring from January 1, 2025, to the date of this search warrant, including:

        a)      communications, in any form, related to ISIS, jihad, acts of violence, or material support to a designated foreign terrorist organization;

        b)      records, documents, materials, or information relating to ISIS, jihad, acts of violence, or material support to a designated foreign terrorist organization;

        c)      records, documents, materials, or information relating to money-transmission services, accounts, and payments, including crypto-currency;

        d)      Any firearm, including a rifle, shotgun, or handgun, and any ammunition;

2.      Computers, or storage media used as a means to commit the violations described above.

3.      For any computer, or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

        a)      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

        b)      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

        c)      evidence of the lack of such malicious software;

        d)      evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e)    evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f)    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g)    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h)    evidence of the times the COMPUTER was used;

i)    passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j)    documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k)    records of or information about Internet Protocol addresses used by the COMPUTER;

l)    records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m)    contextual information necessary to understand the evidence described in this attachment.

4.    Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including

desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

<u>**United States v. AHMAAD AKHTAR**</u>
**Penalties for Criminal Complaint**

<u>**COUNT 1:**</u>

VIOLATION:  18 U.S.C. § 2339B – Attempting to provide material support to a
       designated foreign terrorist organization

PENALTIES:  A maximum of up to 20 years' imprisonment;
       Fine of up to $250,000; or both fine and imprisonment
       Supervised release of any term of years up to life

SPECIAL ASSESSMENT: $100 (mandatory on each count)